ROCHEREAU (REID v.). See Case No. 11,-669.

ROCKAWAY, The (BYRNES v.). See Case No. 2,274.

ROCKEFELLER (TAYLOR v.). See Case No. 13,802.

## Case No. 11,975.

### The ROCKET.

[1 Biss. 354; [1] 3 West. Law Month. 7.]

District Court, D. Wisconsin. Oct., 1860.

PLEADING IN ADMIRALTY — TESTIMONY — INSUFFICIENT ANSWER— BILL OF LADING —INJURY TO GOODS — SEAMANSHIP — COMPASS.

1. Though the answer to a libel is not as full and explicit and distinct as required by rule 27, if no exceptions are taken to it, and the parties proceed to the taking of testimony, objections to the reading of the testimony on the ground of insufficiency of the answer will not be entertained.

2. Where the respondent has shown that the injury was occasioned by a cause excepted from the bill of lading, the burden of proof is thrown upon the libellant, to show negligence or want of reasonable skill and attention.

3. Bad seamanship to run at full speed, in a fog, along shore, where a mistake in reckoning might run the vessel aground. The vessel

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

should stop, or slacken speed and heave the line.

4. Although a dense fog is a danger of navigation, yet the carrier is not excused if the loss occurs by a peril which might have been avoided by the exercise of reasonable skill and diligence.

5. Knowledge of the time required for running between two points on the same side of the lake forms no excuse for continuing the same speed allowable in the open lake.

6. Deflection of compass from some accidental or unforeseen cause, may be a danger of navigation, but before the court would consider it an excuse for an accident, it must be clearly shown, by undoubted proof, that the officers of the vessel understood and discharged their full duty.

7. The theory of magnetic influence in a fog does not require any consideration from the court.

In admiralty. The libellants shipped on board this propeller, at Buffalo, for Milwaukee, several boxes and packages of goods, which, by the bills of lading, were to be delivered in good order, "the dangers of navigation excepted." It is charged in the libel that through the negligence, carelessness, and improper conduct of the master, his mariners and servants, the propeller was run aground on the western shore of Lake Michigan; and by reason whereof, she sprung a leak, and the goods were greatly damaged. The claimant, in his answer, confesses that the propeller was run ashore, and that the goods were greatly damaged; and avers "that the same did not occur by reason of the carelessness of the master and mariners of the vessel, or of any or either of them; but, on the contrary thereof, that the causes of the accident of running ashore or aground, were the dangers of navigation, and the mere act of God."

Finches, Lynde & Miller, for libellants.
Emmons & Van Dyke, for respondents.

MILLER, District Judge. This is not a full, explicit, and distinct answer, as is required by admiralty rule 27. But by rule 28, libellants' counsel might have filed exceptions to the answer, which they failed to do. Testimony having been taken on the part of the claimant, without exceptions to the answer, the libellants cannot object at the hearing to the reading of the testimony on account of the insufficiency of the answer. The libellants had notice, by the answer, that the claimant based his defense upon some danger of navigation, or some act of God; and they tacitly permitted him to make specification by testimony.

By rule 23, the libellant shall propound and articulate, in distinct articles, the various allegations of facts, upon which the libellant relies in support of his suit, so that the defendant may be enabled to answer distinctly and separately the several matters contained in each article. These libellants are held in the proof to the cause of the damage to their goods, propounded in the libel. The rules of pleading in the admiralty must be strictly complied with. The evidence must be con-

fined to points put in issue by the allegations in the libel, and denial of the answer. Lawrence v. Minturn, 17 How. [58 U. S.] 100; McKinty v. Murrish, 21 How. [62 U. S.] 343. In this answer, the charge of negligence is denied; and the general allegation in avoidance was not excepted to. While the testimony on the part of the claimant was being taken, libellants' counsel were present; and having full knowledge of the facts proven, they are not taken by surprise, and cannot be permitted to object to the evidence for insufficiency of the answer. The libellants had the power, by rule, to require a full, explicit, and distinct answer before the testimony was taken.

Depositions of the captain, first mate, assistant engineer, and two wheelsmen, were read on the part of the claimant, and their protest was read on the part of the libellants. The claimant founded the defense upon an alleged deflection of the compass, caused either by magnetic influence on shore or in the fog that prevailed at the time of the accident.

Counsel referred to the case of The Juniata Paton [Case No. 7,584], decided in this court in December, 1852. It was there ruled that, where a bill of lading contains the clause "dangers of navigation excepted," the carrier brings himself within the clause, when he shows that on a dark and stormy night, at the entrance of a harbor difficult of access, he mistook a light on shore, in a line with the pier light, for the latter, whereby the vessel was run ashore, and part of the cargo was damaged. But the carrier, in order to avail himself of the benefit of the restrictive clause, must bring his case strictly within the words of the exception; and for this purpose the burden of proof is upon him. It there appeared that the steamboat Baltic was making for the same light, following in the wake of the Paton, under the belief that it was the harbor light, and did not discover the mistake until the schooner struck. In the opinion it is remarked: "The exception in the bill of lading, of the dangers of navigation is to be understood in a broader sense than to denote natural accidents." It extends to events not attributable to natural causes. It is extended to excuse the carrier from losses by collision of two ships, when no blame is attributable to his ship. But there is no doubt the carrier should not be excused, if the loss occurred by a peril which might have been avoided by the exercise of reasonable skill and diligence. And "where the benefit of an exception is claimed from loss being occasioned by a danger of navigation, it is incumbent on the carrier to bring himself strictly within the terms of it. It is by no means unreasonable to require him to prove the loss and the manner of it, and that usual care and diligence had been used to avoid it. This is peculiarly within his own knowledge, or of those in his employment, and under his control. The shipper is in a greater measure in the carrier's power, from the fact of exclu-

sive custody of the goods. The crew of the vessel are usually the only persons cognizant of the matter, and are not expected to implicate themselves; and the owner can seldom have any other account of his property, or of the facts connected with its loss, than what they may choose to give. For these reasons, testimony from those employed on board, in support of the exemption claimed, must be cautiously considered. But, fortunately for the respondent, the testimony of those witnesses is corroborated, in every particular, by the mate of the steamboat Baltic, and other disinterested witnesses." [Case No. 7,-584.] In Clark v. Barnwell, 12 How. [79 U. S.] 272, the supreme court of the United States decide that, where goods are shipped and the usual bill of lading is given, promising to deliver them in good order, the dangers of the seas excepted, and they are proved to be damaged, the onus probandi is upon the owners of the vessel to show that the injury was occasioned by one of the excepted causes. And, although the injury may have been occasioned by one of the excepted causes, still the owners of the vessel are responsible, if the injury might have been avoided by the exercise of reasonable skill and attention on the part of the persons employed in the conveyance of the goods. But the onus probandi then becomes shifted upon the shipper to show the negligence. Upon these principles of law this cause must be determined.

The propeller was a general ship, in trade between Buffalo and Chicago, stopping at intermediate ports. As such, she was freighted with merchandise, and also with about one hundred and fifty tons of railroad iron, distributed on deck fore and aft. Nothing happened to cause any apprehension of deflection of the compasses, until the accident happened, near the city of Milwaukee. Port Washington lies about twenty-eight miles, a little west of a due north line, from Milwaukee. The vessel put out from Port Washington for Milwaukee, about two o'clock of the morning of the ninth of July. It was then clear star-light. The vessel was put on her full speed, and so continued until the accident happened. The captain remained on deck about ten minutes after leaving Port Washington, running south-east; when he ordered the mate to change to south, south-east, and to run on that course until out three miles from land, and then run south half east, and went below. That was the first trip of the mate as mate. About half an hour afterwards the captain returned on deck, and was informed by the mate that he was steering south half east, and that he thought he was out three miles from land. The captain ordered her hauled out a little more, and that south by east was high enough. The captain then went below and turned in. It was then clear and star-light, and the west bank could be seen, but not with such certainty as to estimate the distance. Running on those first

two courses from Port Washington would require over three-fourths of an hour to make three miles from land; and how long the vessel had been on the last course of south half east, does not appear. When the captain came on deck, she had been out forty minutes, from which it does not appear at all certain that three miles from land had been made; and it is acknowledged that the distance from land could not be reckoned with any certainty at that time. The captain knowing the speed of the vessel, and the mate not being acquainted with the appearance of the land, the order to change the course should have been given with regard to the time out. My impression is, that this order of the captain caused the accident, by leaving the mate in a state of uncertainty. Two vessels afterwards met, lying eastward of the propeller, tends to strengthen this impression, one of those vessels lying twenty-five rods to the east. The propeller, from the fact of meeting those vessels, was on her course, but not enough out to clear the north point, as the sequel will show.

After some time the captain came out again; went to the engine house and found it right; and then to the upper deck, and observed to the mate it was foggy and thick, and advised the mate to stop; then the bells were rung for slower, and then to stop, when they heard a noise which proved to be the surf on shore, and the vessel immediately struck. The captain had not examined the compass. The testimony is that the compass not in the pilot-house, called the tell-tale compass, is less exposed to magnetic influence than those in the pilot-house; and there is usually a variation between this compass and those carried in the pilot-house, from two points down to half a point. It is also testified by the mate that this vessel was navigated by the tell-tale compass. The wheelsmen testify that they steered by the compass in the pilot-house; and that five minutes before the vessel struck, the man at the wheel, from Port Washington, who, in consequence of a sore hand, had to do duty with but one hand, was relieved. The vessel struck heading south, about half a mile west of the track necessary for clearing the north point. The last wheelsman had not been apprised of the difference in the compasses; and those in the pilot-house, by which he steered, stood more to westward than the tell-tale compass, by which, the mate testified he navigated the vessel. At one time the vessel was off her course. It was proven that the course was changed four times after leaving Port Washington; and by comparison of the compasses at the two last changes, they varied from three-fourths to a point. The fog was thick, but there was no wind nor sea. It was about day-break when the vessel struck, about three miles north of Milwaukee. By the testimony of the assistant engineer she had on a full head of steam, and was running at the rate of ten miles an hour, when the order to stop was given.

From the evidence, I am satisfied that the captain and mate were incapable and negligent; and that the first wheelsman, from inability, should not have been required to do duty. It appears that he was discharged soon after, on account of his sore hand.

For some time before the vessel struck, the fog had become so thick, that when the captain came on deck, he concluded not to run, and ordered to stop. The vessel then running at full speed, her forward motion could not be stopped before she struck. This shows that the captain considered it dangerous to run in so thick a fog. I have no doubt but it would have been good seamanship to stop; and I think it was bad seamanship to run at full speed at the time, along shore, where a mistake in reckoning might cause the accident that did occur. After the fog came up, it was the duty of the officers of the vessel to stop, or slacken speed and heave the line, particularly as they had concluded they were near the North Point. This precaution might not be required in the open lake or sea, where vessels would not be so likely to be passed, or accidental causes on shore would not be anticipated.

A dense fog is no doubt a danger of navigation. But when a steam vessel is enveloped in a fog, in a river, or a narrow sea, or while running close along the lake shore, the owners are not excusable, if all reasonable means are not used to avoid accidents. The vessel must either be stopped, or her speed must be slackened and the lead heaved, or she must be put out into the open sea, where practicable, and the whistle must be used. The rule, in the cases above cited, is, that the carrier is not to be excused if the loss occurs by a peril, which might have been avoided by the exercise of reasonable skill and diligence. If a collision had occurred with a vessel, the propeller might not be excused, for she was nearing Milwaukee, a place of extensive commerce with a certainty of passing numerous coasting vessels. The Bay State [Case No. 1,148]; Bullock v. The Lamar [Id. 2,129]; The Perth, 3 Hagg. Adm. 414; The Rose, 2 Wm. Rob. Adm. 1; The Neptune [Case No. 10,120].

The time required for running a steam vessel between ports on the same shore of the lake, is not the only means of ascertaining the port of destination in a fog, and forms no excuse for continuing the same speed that is allowable in the open lake. By a proper and constant use of the whistle and bell, vessels can be led into port by some signal on shore.

No blame can be attached to the vessel for having the railroad iron on deck. This was a general ship, engaged in the coasting trade on the lakes; and such vessels are usually in part freighted with iron, distributed on deck fore and aft, and of which shippers are presumed to have knowledge.

It is not alleged that deflection of the compass was caused by the iron on deck. The

compasses acted well on the voyage and gave no occasion for apprehending defect or unusual variation.

Deflection of the compass from some accidental or unforeseen cause, may be a danger of navigation; but before the court would consider it an excuse for an accident, it must be clearly shown by undoubted proof, that the officers of the vessel understood and discharged their full duty. I do not think that the theory of magnetic influence in the fog, or the evidence of such influence on the western shore of Lake Michigan requires any consideration on the part of the court. A decree for the libellants will be ordered.

See The Portsmouth [Case No. 11,295] in subsequent volume of these reports. Also, as to duty of vessel in fog generally, The Northern Indiana [Case No. 10,320]. Also, Bazin v. Steamship Co. [Id. 1,152].